[Cite as *In re R.W.H.*, 2021-Ohio-4024.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | |
|---|---|
| IN RE: R.W.H. | : |
| | : |
| | :    Appellate Case No. 28880 |
| | : |
| | :    Trial Court Case No. 2016-7436 |
| | : |
| | :    (Appeal from Common Pleas Court- |
| | :    Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of November, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Appellee, Montgomery County Department of Job & Family Services

MARIA L. RABOLD, Atty. Reg. No. 0089080, 110 East Central Avenue, Miamisburg, Ohio 45422
      Attorney for Appellant, Father

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Father appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of his now four-year-old son, R.W.H., to Montgomery County Children Services ("MCCS"). The trial court's judgment also denied a motion for legal custody filed by R.W.H.'s paternal grandmother. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

**{¶ 2}** In early December 2016, MCCS received a report that R.W.H. and his biological mother ("Mother") tested positive for cocaine at the time of R.W.H.'s birth. Shortly after receiving this report, on December 7, 2016, MCCS filed a complaint requesting that the trial court adjudicate R.W.H. as an abused and dependent child and for the court to grant MCCS temporary custody of R.W.H.

**{¶ 3}** In support of its complaint, MCCS alleged that Mother had a history of substance abuse and had admitted to using drugs while she was pregnant with R.W.H. MCCS's complaint also alleged that Mother has had prior cases with Greene County Children Services and that she does not have custody of her three older children. MCCS's complaint further alleged that Father, whose paternity had not yet been established, was a registered sex offender with multiple substance abuse and domestic violence charges. The record indicates that in 1999 and 2000, Father was convicted of

corruption of a minor (now known as unlawful sexual conduct with a minor[1]) in violation of R.C. 2907.04(A), as well as multiple counts of complicity to corruption of a minor in violation of R.C. 2923.03(A)(1). *See* State's Exhibit Nos. 23 and 24. As a result of these convictions, Father has a continuing duty to register as a sex offender.

{¶ 4} On December 7, 2016, the trial court held a shelter care hearing and granted MCCS interim temporary custody of R.W.H. Around that same time, both Mother and Father recommended to MCCS that Father's adult daughter and R.W.H.'s half-sister, S.R., would be a good placement option for R.W.H. However, after being approached about taking care of R.W.H., S.R. and her husband, C.R., initially declined because they did not want to remove R.W.H. from the loving foster home in which he had been placed. S.R. also indicated that she had recently given birth to her third son following a complicated pregnancy and that she could not physically or emotionally care for another infant at that time. S.R. and C.R., however, expressed interest in potentially taking care of R.W.H. in the future.

{¶ 5} On February 1, 2017, the trial court issued a decision adjudicating R.W.H. as an abused and dependent child. The trial court also granted MCCS temporary custody of R.W.H. Approximately 11 months later, on October 27, 2017, MCCS filed a motion for permanent custody of R.W.H. prior to the expiration of its temporary custody. Two months after MCCS moved for permanent custody, Father's paternity was established in December 2017. The delay in establishing Father's paternity was due to MCCS's having

---

[1] After Father's conviction in 2000, R.C. 2907.04 was amended to change the name of the offense "corruption of a minor" to "unlawful sexual conduct with a minor." Despite the change to the name of the offense, the current version of R.C. 2907.04(A) is otherwise identical to the former version. *State v. Barber*, 7th Dist. Columbiana No. 13 CO 12, 2013-Ohio-5281, ¶ 15.

difficulty obtaining Mother's DNA.

{¶ 6} Once Father's paternity was established, Father expressed his desire to have custody of R.W.H. and requested visits with him.   Father first visited R.W.H. on December 27, 2017, along with his daughter, S.R.   Sometime after this visit, Father's relationship with S.R. deteriorated and Father no longer wanted S.R. to have custody of R.W.H.   As a result, on February 20, 2018, Father filed a motion seeking an order granting legal custody of R.W.H. to his own mother, R.W.H.'s paternal grandmother, G.A. On March 23, 2018, G.A. filed a pro se motion to intervene in the case, as well as a motion for legal custody of R.W.H.   The trial court granted G.A.'s motion to intervene and G.A. was added as a party to the case on May 30, 2018.

{¶ 7} On April 17, 2018, MCCS moved for an extension of temporary custody of R.W.H.   On May 30, 2018, the trial court granted MCCS's requested extension and MCCS's motion for permanent custody was withdrawn.   Around that same time, S.R. asked MCCS to commence a home study for purposes of having R.W.H. placed in her home.   Thereafter, MCCS completed home studies for both S.R. and G.A.   The record indicates that MCCS ultimately disapproved G.A.'s home study, but approved S.R.'s. R.W.H. was thereafter placed in S.R.'s home on September 27, 2018, and Father and G.A. continued to have weekly supervised visits with R.W.H. at MCCS's visitation center.

{¶ 8} On June 5, 2018, MCCS filed a motion requesting that the trial court grant legal custody of R.W.H. to S.R. and S.R.'s husband, C.R.   On August 1, 2018, G.A. filed a second motion for legal custody of R.W.H. with the assistance of counsel.   The following month, on September 19, 2018, Father moved to have S.R. and C.R.'s visitation with R.W.H suspended.   The trial court scheduled the aforementioned motions for a

hearing on February 11 and 13, 2019. However, on January 25, 2019, Father filed an affidavit of disqualification against the presiding judge, thereby causing the hearing to be continued. Father's affidavit of disqualification was ultimately denied by the Supreme Court of Ohio on February 12, 2019, and the hearing was rescheduled to take place June 24, 2019.

{¶ 9} On April 24, 2019, S.R. and C.R. became a licensed foster-to-adopt family. Three weeks later, on May 13, 2019, MCCS filed a motion for permanent custody of R.W.H. and later withdrew its motion requesting that the trial court grant legal custody of R.W.H. to S.R. and C.R. After several more delays, including two more affidavits of disqualification filed by Father, both of which were denied by the Supreme Court of Ohio, the trial court held a four-day hearing on July 6 through 9, 2020. The hearing addressed MCCS's motion for permanent custody, G.A.'s motion for legal custody, and Father's motion to suspend S.R. and C.R.'s visitation.

{¶ 10} During the hearing, MCCS presented testimony from R.W.H.'s gastroenterologist, Dr. Shelly Rustagi; MCCS social program specialist, Dr. Dawn Morton; MCCS caseworkers Bradley Woods and Catelin Covell; and R.W.H.'s half-sister and current foster parent, S.R. G.A. and Father, who were both acting pro se during the hearing, testified on their own behalf. Father also called one witness, Officer Jeff Heiber of the Dayton Police Department. R.W.H.'s guardian ad litem ("GAL") also testified at the hearing and provided a custody recommendation to the trial court. The following is a summary of all the testimony and evidence that was presented at the hearing.

*Dr. Shelly Rustagi*

{¶ 11} Dr. Rustagi testified that she was a gastroenterologist at Dayton Children's Hospital who diagnosed R.W.H. with a swallowing disorder known as dysphagia. Dr. Rustagi explained that dysphagia can cause choking and liquid to enter the windpipe and lungs. Dr. Rustagi also explained that dysphagia can result in inflammation of the breathing passages and chronic lung disease.

{¶ 12} Dr. Rustagi testified that, because R.W.H. has dysphagia, great care needs to be taken with regard to his diet and the size of the food he consumes. Dr. Rustagi testified that a prescribed thickener must be administered to R.W.H.'s liquids. Dr. Rustagi also testified that R.W.H.'s food must be cut up into small pea-sized bites to prevent choking and that R.W.H must be carefully monitored while eating and drinking. Dr. Rustagi additionally recommended that R.W.H.'s caretakers keep a daily log of the food he consumes due to his suffering from severe diarrhea. Dr. Rustagi indicated that the food log would help determine what foods caused R.W.H.'s diarrhea.

{¶ 13} Dr. Rustagi testified to writing several letters detailing her feeding and food log recommendations due to concerns that her recommendations were not being adhered to during visitations with Father and G.A. Dr. Rustagi identified her letters at trial, and the letters were admitted into evidence as State's Exhibit Nos. 7 through 12. Dr. Rustagi testified that Father had expressed a belief that she had misdiagnosed R.W.H. with dysphagia; Father approached her about obtaining a second opinion, and she told Father she had no problem with him doing so. Dr. Rustagi, however, testified that, to her knowledge, no second opinion had ever been obtained by Father.

*Dr. Dawn Morton*

{¶ 14} Dr. Dawn Morton testified that she was an MCCS Social Program Specialist in MCCS's visitation center. Dr. Morton testified that she performed visitation assessments for Father, G.A., and S.R. by observing their interactions with R.W.H. With regard to Father, Dr. Morton testified that Father appeared bonded to R.W.H. and that Father clearly wanted a relationship with R.W.H. Dr. Morton testified that Father was playful with R.W.H., provided toys for him, and held and supported R.W.H. while he attempted to walk.

{¶ 15} Dr. Morton, however, testified that Father had reoccurring negative emotional expressions during visitations that were challenging for Father to control. Dr. Morton testified that Father appeared to be unaware of the impact that his negative emotional expressions had on R.W.H. Dr. Morton also testified that there were only small amounts of time during which Father was positively engaged with R.W.H., as Dr. Morton indicated that Father spent most of his visits complaining about MCCS.

{¶ 16} Dr. Morton also testified that Father expressed disagreement with R.W.H.'s medical diagnosis. Dr. Morton recalled that when discussing R.W.H.'s medical condition, Father had consistently said that he was "gonna work it out of him." Tr. p. 202. Dr. Morton also testified regarding an incident where Father gave R.W.H. water to drink without administering the prescribed thickener even though Father knew the thickener was medically necessary. When confronted about his failure to administer the thickener, Dr. Morton testified that Father simply indicated that he "couldn't remember." *Id.*

{¶ 17} With regard to G.A., Dr. Morton testified that G.A. was engaged and animated with R.W.H., brought toys for him, and spent a lot of time working with him on his verbal abilities. Dr. Morton testified, however, that G.A. had difficulty keeping R.W.H.

in the visitation room and had difficulty catching up to him when he would run away, which Dr. Morton found to be a safety concern. Dr. Morton also testified that G.A. hesitated when R.W.H. was choking on a piece of apple and that G.A. had to be told to take the apple out of R.W.H.'s mouth.

{¶ 18} Concerning S.R., Dr. Morton testified that she had no concerns with R.W.H.'s being in S.R.'s care. Dr. Morton described S.R. as being very engaged, energetic, and playful with R.W.H., as well as with her own children. Dr. Morton also testified that S.R. and C.R. provided a lot of love and affection to R.W.H. and that R.W.H. exhibited attachment behavior toward them. Dr. Morton testified that they were all bonded to each other and that there was no concern that R.W.H. was treated differently from S.R. and C.R.'s other children.

{¶ 19} Dr. Morton additionally testified that S.R. was aware of R.W.H.'s medical condition and developmental delays, and that S.R. stayed abreast of changes in R.W.H.'s medical intervention. Dr. Morton testified that S.R. transported R.W.H. to all of his medical, occupational therapy, and speech therapy appointments. Dr. Morton also testified that S.R. had successfully adapted to revolving her schedule around R.W.H.'s needs while also to continuing with her other children's scheduled activities.

*Bradley Woods and Catelin Covell*

{¶ 20} Both Bradley Woods and Catelin Covell testified to being MCCS caseworkers assigned to R.W.H.'s case at various times. Woods and Covell testified to providing both Mother and Father with case plans listing various objectives for them to complete in order to reunify with R.W.H. They testified that Mother's case plan

objectives were to complete mental health and drug and alcohol assessments, complete parenting classes, demonstrate skills learned from the parenting classes, complete parenting and psychological evaluations, submit to random drug screens, complete domestic violence classes, visit with R.W.H. consistently, obtain and maintain appropriate housing and income, and sign all releases of information.

{¶ 21} Woods and Covell testified that Mother had not completed any of her case plan objectives and that her whereabouts were often unknown.  Covell testified that Mother visited R.W.H. twice in 2016, twice in 2017, four times in 2018, and once in 2019.  Covell also testified that in 2019, Mother had "a couple" of visits with R.W.H. outside of MCCS through S.R.  Tr. p. 514.  Covell testified that Mother expressed her desire for R.W.H to remain with S.R. and that Mother did not want R.W.H. to have any contact with Father.  Covell also testified that Mother wrote a letter to MCCS on March 20, 2019, stating that she preferred for R.W.H. to be permanently placed with S.R. and C.R.  Mother's letter was admitted into evidence as State's Exhibit No. 27.

{¶ 22} With regard to Father, Covell and Woods testified that prior to Father's paternity being established in December 2017, Father's case plan objectives were to establish paternity, demonstrate parenting skills, obtain and maintain appropriate housing and income, sign releases of information, and comply with any legal restrictions.  Woods testified that on February 1, 2017, he reviewed MCCS's case plan with Father and asked Father about the sex offense for which he had been convicted.  Woods testified that Father advised him that a jury had found him guilty of corruption of a minor and that the incident involved a 15-year-old boy.  Woods also identified certified copies of sentencing entries showing that Father was convicted of one count of corruption of a minor in violation

of R.C. 2907.04, as well as three counts of complicity to commit corruption of a minor in violation of R.C. 2923.03(A)(1).   *See* State's Exhibit Nos. 23 and 24.

{¶ 23} Covell testified that after Father's paternity was established, Father's case plan was updated to reflect that he was R.W.H.'s biological father.   Father's case plan was also amended to set forth additional objectives for reunification.   Covell and Woods testified that the amended case plan objectives were to complete mental health and drug and alcohol assessments, obtain and maintain appropriate housing and income, visit with R.W.H. consistently, complete batterer's intervention classes, complete a sex offender education program, complete a visitation assessment, complete a parenting and psychological evaluation, refrain from illegal activity, decrease hostility toward MCCS staff, support R.W.H., attend R.W.H.'s medical appointments, submit to random drug screens, and sign releases of information.

{¶ 24} With regard to visitation, Woods and Covell testified that Father visited with R.W.H. consistently at MCCS's visitation center and completed a visitation assessment. Woods testified that Father would bring toys for R.W.H. and was capable of appropriate interactions with him.   Woods testified, however, that Father oftentimes had difficulty compartmentalizing his disdain for MCCS from his visitation with R.W.H.   Woods testified that Father would frequently yell at MCCS staff and complain about MCCS during his visits with R.W.H.   Covell similarly testified that Father had angry verbal outbursts during his visits with R.W.H. and noted that R.W.H. would appear scared while Father was yelling.   Woods and Covell testified that Father was trespassed from MCCS property in August 2019, after Father made comments that threatened serious physical harm to MCCS staff during a visit with R.W.H.   A copy of the trespass notice was admitted into

evidence as State's Exhibit No. 25.

{¶ 25} Woods also testified that Father made inappropriate comments in front of R.W.H. during visits. For example, Woods testified that when he presented Father with a letter from Mother in April 2019, Father proceeded to tell R.W.H. that Mother was his "real mommy" and then referenced Mother's skills as an exotic dancer by saying that "[s]he could really work a pole." Tr. p. 694. Woods and Covell also testified that they had concerns about Father's not complying with Dr. Rustagi's feeding recommendations during visitations and that Father had expressed a belief that R.W.H. had been misdiagnosed.

{¶ 26} Woods further testified that Father refused to sign releases of information, failed to submit to random drug screenings, provided no verification of completing a sex offender education program, failed to complete mental health and drug and alcohol assessments, failed to attend an age-appropriate parenting class, and failed to control his hostility toward MCCS. Accordingly, Woods testified that Father has not completed a majority of his case plan objectives.

{¶ 27} Woods additionally testified that Father indicated in June and July 2018, that he was not interested in working on a case plan. Woods testified that when he tried to contact Father for purposes of discussing his case plan, Father would oftentimes insult Woods' intelligence and call him names such as "weak," "moron," and "poor little case worker." Tr. p. 708. Woods also testified that Father made statements threatening his employment.

{¶ 28} With regard to G.A., Covell testified that G.A. was also provided with a case plan. Covell testified that G.A.'s case plan objectives were to complete parenting

classes, complete parenting and psychological evaluations, sign all releases of information, visit consistently with R.W.H., and participate in a visitation assessment. Covell testified that G.A. completed all of her case plan objectives, but that MCCS still had several concerns with regard to R.W.H. being in G.A.'s care.

{¶ 29} For example, Covell testified that MCCS was concerned with G.A.'s understanding and appreciation of R.W.H.'s medical needs as they related to his diet and feeding, as well as G.A.'s ability to appropriately address those needs. Despite being informed of R.W.H.'s medical condition, Covell testified that G.A. did not want to write in R.W.H.'s food log. Covell also testified that G.A. had to be constantly instructed on how to administer the thickener to R.W.H.'s liquids. Covell testified that there were also concerns that G.A. would provide Father with unfettered access to R.W.H., even if there were a no-contact order in place. In fact, Covell testified that G.A. had specifically told her that she would not cut off contact with Father even if ordered to do so by the court. Covell testified that G.A.'s home study was denied because of G.A.'s lack of understanding of R.W.H.'s needs, concerns about G.A.'s relationship with Father, and because there was confusion as to where R.W.H.'s bedroom would be placed in G.A.'s home and whether there was ventilation upstairs.

{¶ 30} With regard to S.R. and C.R., Woods and Covell testified that they had no concerns with R.W.H.'s being in their care. Woods and Covell testified that R.W.H. fit into S.R. and C.R.'s home well and was bonded to them and their three sons, who R.W.H. referred to as his brothers. Woods testified that, when the children would fight over toys, S.R. would effectively intervene and calm the situation. Woods testified that S.R. and C.R. provided a stable, safe environment and had been consistently meeting R.W.H.'s

needs. Woods also specifically testified that it was in R.W.H.'s best interest to remain in S.R. and C.R.'s care.

*S.R.*

{¶ 31} S.R. testified that she was R.W.H.'s half-sister and current foster parent, that she was married to C.R., and that they had three biological sons, who at the time of trial were eight, six, and three years old. S.R. testified that R.W.H. and her youngest son were only three and a half months apart in age. S.R. testified that she recently had a fourth child, a daughter, who was born in 2020.

{¶ 32} S.R. testified that she, C.R., and their children all lived in a residence located on 14 acres of land where there were a lot of things for kids to do. S.R. testified that they had farm animals, bikes, playhouses, a swing set, a sand box, and a swimming pool. S.R. testified that she and C.R. loved R.W.H. and treated R.W.H. as their own child. S.R. testified that R.W.H. enjoyed playing with her sons and had normal sibling interactions with them.

{¶ 33} S.R. testified that she followed all of Dr. Rustagi's recommendations and that she went to all of R.W.H.'s doctor's appointments, including appointments for occupational and speech therapy. S.R. also testified to enrolling R.W.H. in preschool.

{¶ 34} With regard to visitation, S.R. testified that R.W.H. would exhibit self-destructive behaviors after visiting Father and G.A. Specifically, S.R. testified that R.W.H. would punch himself in the nose and scratch himself. S.R. also testified that after visits with Father, R.W.H. would say: "[Father] mad. [Father] yell." Tr. p. 455.

{¶ 35} S.R. testified that when visits with G.A. were suspended due to the COVID-

19 pandemic (Father's visits had already been suspended in August 2019 due to his criminal trespass), R.W.H.'s behavior improved. Specifically, S.R. testified that R.W.H. stopped engaging in destructive and aggressive behaviors and had wonderful moods and attitudes. S.R. testified that when visits with G.A. resumed in June 2020, R.W.H.'s behavior regressed significantly. For example, S.R. testified that R.W.H. busted holes in his bedroom wall and closet door, ripped up his favorite blanket, ripped a piece of siding off their house, and began urinating his pants after having already been potty-trained.

*G.A.*

{¶ 36} G.A. testified that she was a 75-year-old retiree in good health who lived alone in the country. G.A. testified that she lived in a quiet neighborhood where there were no children nearby with whom R.W.H. could play. G.A. expressed her belief that R.W.H. should not be placed in S.R. and C.R.'s home because there were too many children living there. G.A. also testified that she had provided S.R. and C.R. with thousands of dollars of financial support and indicated that she was more financially stable than S.R. and C.R. G.A. further expressed her belief that S.R. and C.R. wanted to take in R.W.H. simply for purposes of financial gain.

{¶ 37} G.A. testified that she would not turn her back on Father even though she did not agree with everything Father did. G.A. testified that she would not cut off contact with Father, but also testified that she would abide by a court order to keep Father from having contact with R.W.H. G.A. also testified that she believed it was important for R.W.H. to have a relationship with his biological parents and that she would permit Father to have supervised visits.

{¶ 38} G.A. testified that Father currently lived in a property that she owned and that Father paid her $1 a month in rent. G.A. testified that it had been several years since Father had lived with her, and that she had tried unsuccessfully to have her address removed from the Greene County sex offender registry.

{¶ 39} During her testimony, G.A. admitted that she did not want to write in the food log during visits with R.W.H. G.A. explained that her visits with R.W.H. were only two hours long and that taking five to ten minutes to write in a food log was not fair to her or to R.W.H.

*Father*

{¶ 40} Father testified that MCCS had harassed him since R.W.H.'s birth. Father also expressed his belief that everyone involved in this matter had conspired against him. Father testified that he believed that MCCS and S.R. were using R.W.H. as a "cash cow." Tr. p. 802. Father also testified that he had attempted to work on his case plan, but received no help from MCCS in completing it. Father further testified that he did not agree with the requirements in his case plan. Father claimed that he had completed the objectives in his first case plan, and that he objected to all of the subsequent case plans that were provided to him by MCCS.

{¶ 41} Father testified that he did not dispute R.W.H.'s dysphagia diagnosis, but simply wanted a second opinion. According to Father, MCCS prohibited him from getting a second opinion. Father claimed that he did not administer the thickener to R.W.H.'s water on one occasion because the thickener was not provided to him during the visit in question. Although Father admitted that he was a "rough" person, he denied making the

threats underlying his trespass from MCCS's visitation center. *Id.* at 852-53 and 890. Father also denied ever requesting that S.R. be a placement option for R.W.H. Father testified that he believed it was in R.W.H.'s best interest to be placed with G.A.

*Officer Jeff Heiber*

{¶ 42} Officer Jeff Heiber of the Dayton Police Department testified that on May 1, 2019, he responded to a minor traffic accident on the I-75 entrance ramp near North Main Street in Dayton, Ohio. Officer Heiber's testimony indicated that when he arrived at the scene of the accident, he observed that Father's truck had been rear-ended by another vehicle. Officer Heiber testified that the other vehicle was driven by a male who was transporting a small child. Officer Heiber testified that it was the other driver who called for assistance and that the other driver reported that Father had forced him off the road. Despite this, Officer Heiber testified that since the damage was to the back of Father's truck, he cited the other driver for the incident. Officer Heiber testified that both vehicles involved were operable after the accident and that no injuries were observed.

*GAL*

{¶ 43} The GAL testified that he investigated the May 1, 2019 traffic accident and learned from S.R. that Father had followed her husband, C.R., in his vehicle after C.R. had picked up R.W.H. from a visit with Father. The GAL testified that S.R. reported to him that Father began to cut C.R. off in traffic in an attempt to cause an accident. According to the GAL, S.R. also advised that when C.R. attempted to make a right-hand turn onto the I-75 entrance ramp, Father sped up, turned in front of C.R., and caused C.R.

to rear-end Father's truck. The GAL testified that C.R. was the individual who called the police after the accident and that C.R. did not speak to Father during the incident.

{¶ 44} In addition to the traffic accident, the GAL testified to investigating multiple complaints made by Father concerning R.W.H.'s health and safety. The GAL testified that Father reported observing certain injuries to R.W.H. that were inflicted while in S.R. and C.R.'s care. The GAL testified that he investigated all the reported injuries and that his investigation revealed no evidence any of abuse or neglect by S.R. or C.R.

{¶ 45} In providing his custody recommendation to the trial court, the GAL testified that Father's past and current behaviors were safety concerns. The GAL also testified that Father had not completed all of his case plan objectives and that the uncompleted objectives were significant ones. The GAL further testified that he believed G.A. would allow Father to have unsupervised visits with R.W.H., and that G.A. would not be able to protect R.W.H. from Father. The GAL additionally expressed his concern that R.W.H. would not have any relationship with his Mother or S.R. if G.A. were to be granted legal custody.

{¶ 46} Continuing, the GAL testified that S.R. was best able to meet R.W.H.'s educational, physical, and mental health needs. The GAL also testified that R.W.H. needed parental nurturing, passive structure, and a loving family, which he believed S.R. and her family could provide. Therefore, the GAL recommended that the trial court grant MCCS permanent custody of R.W.H. and for R.W.H. to remain placed with S.R.

*The Trial Court's Decision*

{¶ 47} After considering the testimony and evidence presented at the permanent

custody hearing, the trial court granted MCCS's motion for permanent custody and terminated Mother's and Father's parental rights. The trial court also denied both G.A.'s motion for legal custody and Father's motion to suspend S.R. and C.R.'s visitation. Father now appeals from the trial court's judgment, raising five assignments of error for review. Because Father's first and second assignments of error are interrelated, we will address those assignments of error together.

**First and Second Assignments of Error**

{¶ 48} Under his first assignment of error, Father contends that the trial court erred in granting MCCS permanent custody of R.W.H. because MCCS failed to present clear and convincing evidence establishing that it was in R.W.H.'s best interest to award MCCS permanent custody. Under his second assignment of error, Father contends that the trial court's decision granting MCCS permanent custody was against the manifest weight of the evidence. We note that Father is not asking this court to award him custody of R.W.H. Father is instead asking this court to grant G.A. legal custody and to reinstate Father's parental rights.

{¶ 49} R.C. 2151.414 governs the termination of parental rights in Ohio. Section (B)(1) of the statute provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. *In re R.L.,* 2d Dist. Greene Nos. 2013-CA-46, 2013-CA-50, 2014-Ohio-3955, ¶ 7. The statute requires the trial court to find by clear and convincing evidence that: (1) an award of permanent custody to the agency is in the child's best interest; and (2) any one of the following factors enumerated in R.C. 2151.414(B)(1)(a)-(e) exist:

(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 50} With regard to the best-interest determination, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors, including but not limited to the following:

(a) The interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been

in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e) Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 51} All of the trial court's findings under R.C. 2151.414(B)(1) and (D)(1) must be supported by clear and convincing evidence. *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7. "Clear and convincing evidence" is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

{¶ 52} "The [trial] court's decision to terminate parental rights * * *will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "On review, we give the trial court's final determination 'the utmost

respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In the Matter of G.B.*, 2d Dist. Greene No. 2017-CA-30, 2017-Ohio-8759, ¶ 8, quoting *In re Alfrey*, 2d Dist. Clark No. 2001-CA-83, 2003-Ohio-608, ¶ 102. Therefore, the trial court's decision will not be reversed absent an abuse of discretion. *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48.

**{¶ 53}** In this case, when granting MCCS permanent custody of R.W.H., the trial court applied the two-part test in R.C. 2151.414 and found that: (1) R.W.H. has been in the temporary custody of a public services agency for 12 or more months of a consecutive 22-month period; and (2) granting MCCS permanent custody was in R.W.H.'s best interest. We will now review the trial court's findings.

### 1. *Temporary Custody of a Public Services Agency for 12 or More Months of a Consecutive 22-Month Period*

**{¶ 54}** The record indicates that the trial court granted MCCS temporary custody of R.W.H. on February 1, 2017, and that R.W.H. was still in the temporary custody of MCCS when it filed its motion for permanent custody on May 13, 2019. Therefore, at the time MCCS filed its motion for permanent custody, R.W.H. had been in the temporary custody of MCCS for 27 consecutive months. Accordingly, there was clear and convincing evidence in the record supporting the trial court's finding that R.W.H. had been in the temporary custody of a public services agency for 12 or more months of a consecutive 22-month period.

**{¶ 55}** Father nevertheless disputes this finding by arguing that it was *possible* for

R.W.H. to have been placed with a relative within 12 months of being adjudicated abused and dependent. Father claims that this was the case because: (1) Father's paternity test results were delayed until eight months after the trial court granted MCCS temporary custody of R.W.H.; and (2) MCCS filed its June 5, 2018, motion to grant legal custody to a relative (S.R.) only six months after Father's paternity was established.

{¶ 56} The factor under R.C. 2151.414(B)(1)(d), however, does not invite the court to speculate as to whether R.W.H. *could have been* placed in another's custody during the relevant time frame. The requirement is simply that the child *was* in the temporary custody of a public services agency for 12 or more months of a consecutive 22-month period. Regardless of what could have happened, or even what Father believes should have happened, the fact remains that R.W.H. had been in the temporary custody of MCCS for more than two years at the time MCCS filed its motion for permanent custody. Therefore, the factor enumerated in R.C. 2151.414(B)(1)(d) was satisfied.

## 2. Best Interest of the Child

{¶ 57} It must next be determined whether granting permanent custody to MCCS was in R.W.H.'s best interest. In making a best-interest determination, the trial court weighed the relevant factors under R.C. 2151.414(D)(1) and made the following findings from the testimony and evidence presented at the permanent custody hearing.

### (a) Child's Interaction and Interrelationship with Parents, Siblings, and Foster Parents

{¶ 58} The trial court found that Mother had exercised minimal visitation with

R.W.H. throughout this matter and that there was no evidence of Mother's having any bond or relationship with R.W.H. due to her lack of contact and visitation. This finding was supported by clear and convincing evidence, as Covell testified that Mother only visited R.W.H. twice in 2016, twice in 2017, four times in 2018, once in 2019 at MCCS's visitation center, and a couple of times with S.R. in 2019. The evidence also established that Mother wrote a letter on March 20, 2019, stating that she wanted R.W.H. to be permanently placed with S.R. and C.R.

{¶ 59} With regard to Father, the trial court found that Father cared for R.W.H. and visited him consistently before his visitation was suspended in August 2019. The trial court also found that Father had the ability to act appropriately toward R.W.H. during visits, but that he would frequently argue with MCCS staff and complain about MCCS during his visits. The trial court found that Covell observed that R.W.H. had been scared during Father's verbal outbursts and that Woods overheard Father make inappropriate comments while R.W.H. was present. The trial court also found that Dr. Morton believed that Father failed to appreciate how his behavior toward MCCS staff could have a negative impact on R.W.H. All of these findings were clearly and convincingly supported by the testimony presented at trial.

{¶ 60} Concerning G.A., the trial court found that G.A. visited R.W.H. consistently, was appropriate with R.W.H., and appeared to care for R.W.H. In reviewing Dr. Morton's visitation assessment (State's Exhibit No. 15), the trial court found that Dr. Morton reported that R.W.H. appeared to be comfortable in G.A.'s presence. These findings were clearly and convincingly supported by the testimony and evidence presented at trial.

{¶ 61} When reviewing R.W.H.'s relationship with S.R. and C.R., the trial court

found that R.W.H. had been in S.R. and C.R.'s home since September 2018. The trial court also found that S.R. and C.R. had visited R.W.H. prior to that time through his previous foster family and through MCCS visitation. The trial court found that R.W.H. appeared to be well cared for in S.R. and C.R.'s home. The trial court found that MCCS case workers Covell and Woods, as well as Dr. Morton, observed a clear bond and affection between R.W.H. and S.R. and C.R. The trial court also found that R.W.H. had a good relationship with the other children in S.R. and C.R.'s home, as well as with S.R. and C.R.'s extended family. All of these findings were clearly and convincingly supported by the testimony and evidence presented at trial.

### (b) Wishes of the Child

{¶ 62} The trial court found that R.W.H. was too young to express his wishes and had speech and developmental delays. This finding was also supported by the record, as R.W.H. was only three years old at the time of the permanent custody hearing and the evidence established that R.W.H. had ongoing developmental delays. Therefore, this factor was neutral for purposes of making a best-interest determination.

### (c) Custodial History of the Child

{¶ 63} The trial court found that R.W.H. had been removed from Mother's care at birth in December 2017, and was thereafter placed with a foster family following a grant of interim temporary custody to MCCS. The trial court found that R.W.H. remained with the initial foster family until September 2018, at which time he was placed with his relatives S.R. and C.R., who later became licensed as a foster-to-adopt family in April

2019. The trial court found that R.W.H. had been living with S.R. and C.R. ever since, and thus had been in MCCS's care for 12 or more months of a consecutive 22-month period. Upon review, we find that there was clear and convincing evidence supporting the trial court's findings under this factor.

(d) Child's Need for Legally Secure Permanent Placement

{¶ 64} The trial court found that R.W.H. was in need of a legally secure, permanent placement, which could not be achieved without granting permanent custody to MCCS. This finding was also supported by clear and convincing evidence in the record. For example, the evidence established that Mother only visited R.W.H a few times a year and had not maintained consistent contact with MCCS. Mother had also not completed any of her case plan objectives, and her whereabouts were often unknown. Mother's older children had been placed outside of her custody, and Mother submitted a letter to MCCS indicating a preference that R.W.H. be permanently placed with S.R. and C.R.

{¶ 65} The evidence also establishes that Father failed to complete his case plan objectives and expressed an unwillingness to work on his case plan. Although Father visited with R.W.H. consistently and displayed the ability to act appropriately toward R.W.H., Father nevertheless had continual negative, angry interactions with MCCS staff during visitations and failed to appreciate the negative affect this had on R.W.H. In addition, Father was trespassed from MCCS property in August 2019 after making threats of severe physical harm to MCCS staff, and his visitation was suspended as a result. The evidence also established that Father lacked an appreciation for R.W.H.'s medical condition and would on occasion fail to follow Dr. Rustagi's recommendations.

{¶ 66} While Father expressed a preference for R.W.H. to be placed with G.A., who filed a motion for legal custody, the evidence established that G.A.'s home study failed and that there were concerns regarding G.A.'s ability to provide for R.W.H.'s needs. The evidence indicated that there were also concerns regarding G.A.'s understanding and appreciation of R.W.H.'s medical condition.  Most significantly, the evidence established that there existed a concern that G.A. would provide Father with unfettered access to R.W.H. if she were to be granted legal custody.  Although G.A. testified that she would abide by a court order for Father not have contact with R.W.H., she also made it clear that she would always stand by Father and would not cut off contact with him.

{¶ 67} The evidence established that S.R. and C.R. were initially explored as a relative placement option when R.W.H. was first born, and that R.W.H. was eventually placed with them in September 2018.  Since that time, S.R. and C.R. had become a licensed foster-to-adopt family and had expressed their wish to adopt R.W.H.  The evidence established that R.W.H. was well cared for by S.R. and C.R.  The evidence also established that there was a clear bond between R.W.H. and S.R. and C.R., and that R.W.H. shared a positive relationship with S.R. and C.R.'s other children and S.R. and C.R.'s extended family.  The evidence further established that S.R. and C.R. were active in R.W.H.'s medical care and that they were well suited to address R.W.H.'s physical, mental, and emotional needs.

(e) Factors Under R.C. 2151.414(E)(7)-(E)(11)

{¶ 68} The trial court found that factor (E)(7)(d) applied to Father because he had been convicted of corruption of a minor/unlawful sexual conduct with a minor in violation

of R.C. 2907.04. The factor under (E)(7)(d) states that "the parent has been convicted or pleaded guilty to * * * an offense under section * * * 2907.04 * * * of the Revised Code * * * and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense[.]" R.C. 2151.414(E)(7)(d). While MCCS presented evidence establishing that Father was convicted under R.C. 2907.04, *see* State's Exhibit Nos. 23 and 24, there was nothing in the record establishing whether the victim of the offense was "the child, a sibling of the child, or another child who lived in the parent's household." The only information provided about the victim was that the victim was a 15-year-old boy. Therefore, the trial court's finding under (E)(7)(d) was not supported by clear and convincing evidence.

{¶ 69} The trial court also found that factor (E)(10) applied to Mother. The factor under (E)(10) states that "the parent has abandoned the child." R.C. 2151.414(E)(10). Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." The testimony presented at trial established that Mother had failed to visit or maintain contact with R.W.H. for more than 90 days during multiple intervals throughout the pendency of this matter. Therefore, the trial court's finding under (E)(10) was supported by clear and convincing evidence.

{¶ 70} The trial court further found that factor (E)(11) applied to Mother. The factor under (E)(11) states that "the parent has had parental rights involuntarily terminated with respect to a sibling of the child[.]" R.C. 151.414(E)(11). The evidence presented at trial established that Mother had two older children who were placed in the permanent

custody of Greene County Children Services.  *See* State's Exhibit No. 22.  Therefore the trial court's finding under (E)(11) was supported by clear and convincing evidence.

{¶ 71} In light of the foregoing best-interest analysis, we cannot say that the trial court abused its discretion in finding that it was in R.W.H.'s best interest to award permanent custody to MCCS.  With the exception of the finding under R.C. 2151.414(E)(7)(d), there was clear and convincing evidence in the record to support all of the trial court's findings under R.C. 2151.414.  Those findings, as discussed more fully above, weighed in favor of granting MCCS permanent custody of R.W.H.  Therefore, the trial court's decision terminating Mother and Father's parental rights, granting MCCS permanent custody of R.W.H., and denying G.A.'s motion for legal custody was not against the manifest weight of the evidence or an abuse of discretion.

{¶ 72} Father's first and second assignments of error are overruled.

**Third Assignment of Error**

{¶ 73} Under his third assignment of error, Father asserts that he received ineffective assistance of counsel from the six attorneys who were appointed to represent him during this case.  Specifically, Father argues that he received ineffective assistance because: (1) one of his attorneys did not subpoena witnesses for the permanent custody hearing; (2) one of his attorneys filed a motion to withdraw as counsel that painted Father in a light that swayed the trial court against him; (3) several of his attorneys withdrew as counsel, leaving him without continual representation; and (4) all six of his attorneys failed to file objections to his case plan.

{¶ 74} This court has previously held that "R.C. 2151.352 and Juv.R. 4 establish a

parent's right to counsel in termination proceedings." (Citation omitted.) *In re S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, ¶ 8. "A parent's right to counsel arises from the guarantees of due process and equal protection contained in the constitutions of Ohio and the United States." (Citation omitted.) *Id.* A parent's right to counsel "includes the right to the effective assistance of trial counsel." (Citation omitted.) *Id.*

{¶ 75} A parent may waive his or her right to counsel in a permanent custody proceeding, but must do so voluntarily, knowingly, and intelligently. *In re R.K.*, 152 Ohio St.3d 316, 2018-Ohio-23, 95 N.E.3d 394, ¶ 13 (French, J., concurring), citing *In re Bowens*, 11th Dist. Ashtabula Nos. 92-A-1711 and 92-A-1717, 1995 WL 803811, *2 (Nov. 9, 1995). To establish an effective waiver of the right to counsel, the trial court must make a sufficient inquiry to determine whether the waiving party fully understands and intelligently relinquishes that right. *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph two of the syllabus. An effective waiver of the right to counsel necessarily waives the right to raise a claim of ineffective assistance of counsel. *State v. Adams*, 7th Dist. Mahoning No. 14 MA 0077, 2016-Ohio-891, ¶ 28, citing *State v. Turner*, 8th Dist. Cuyahoga No. 88958, 2007-Ohio-5732, ¶ 37-40.

{¶ 76} In this case, Father does not dispute that he waived his right to counsel prior to the permanent custody hearing, nor does he challenge the voluntary, knowing, or intelligent nature of his waiver. Prior to waiving his right to counsel, the trial court advised Father that he had a constitutional right to be represented by counsel and that the trial court would not be able to assist Father with presenting his case if he were to represent himself. The trial court also advised Father that he was going to be held to the same standards and rules of evidence that any attorney would be required to follow during the

permanent custody hearing. The trial court further inquired into Father's educational background, determined that Father could read and write, and confirmed Father's ability to prepare and file motions. Most significantly, the trial court advised Father that representing himself during the permanent custody hearing would foreclose his ability to raise a claim of ineffective assistance of counsel on appeal. Therefore, because Father effectively waived his right to counsel, we find that he may not now raise an ineffective assistance of counsel claim.

**{¶ 77}** Even if Father had not waived his right to counsel, his ineffective assistance claims would still fail because they all lack merit. The test that is used for analyzing ineffective assistance of counsel claims in permanent custody cases is the same test that is used in criminal cases. *In re S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, at ¶ 8. Therefore, "[i]n order to prevail on a claim of ineffective assistance of counsel, [Father] must show both deficient performance and resulting prejudice." *Id*. at ¶ 9, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). More specifically, Father "must establish both that his trial counsel's conduct did not fall within the range of reasonable professional assistance, and that there is a reasonable probability that the outcome of the proceedings would have been different had counsel's performance not been deficient." *In re A.J., Jr.*, 2d Dist. Montgomery No. 27808, 2018-Ohio-1052, ¶ 38, citing *Strickland.*

**{¶ 78}** As previously noted, Father initially claims that one of his attorneys provided ineffective assistance because the attorney failed to subpoena witnesses for the permanent custody hearing. Father testified, however, that he was able to issue subpoenas for the hearing. *See* Tr. p. 814. The record also indicates that one of

Father's subpoenaed witnesses, Officer Heiber, appeared at court and testified at the hearing. Since Father's subpoenas were issued, Father fails to establish that the outcome of his case would have been different but for his attorney's alleged error.

{¶ 79} Father also claims that one of his attorneys provided ineffective assistance because the attorney filed a motion to withdraw as counsel that painted Father in a light that swayed the trial court against him. We have reviewed the motion at issue and its contents indicate that the attorney requested to withdraw as Father's counsel because Father had acted in an unprofessional manner toward the attorney, made various threats to the attorney, called the attorney names, recorded phone calls with the attorney after the attorney asked him not to, sought legal advice from outside counsel, and requested that the attorney withdraw from the case on numerous occasions. Regardless of whether the information in the motion painted Father in a bad light, the record indicates that the trial court's permanent custody decision was not based on any of the information in the attorney's motion to withdraw. Simply put, there is nothing in the record establishing that the motion to withdraw affected the outcome of the permanent custody hearing in any way. Therefore, Father has failed to establish that he was prejudiced by the attorney's motion to withdraw.

{¶ 80} Father next argues that he received ineffective assistance of counsel because several of his attorneys moved to withdraw as his counsel, thus leaving him without consistent legal representation. As previously noted, Father was appointed six different attorneys in this matter. Father's first attorney withdrew because Father failed to communicate with the attorney. Father's second attorney was removed by the trial court at Father's request. Father's third attorney moved to withdraw from representing

Father because the attorney had previously represented C.R. and believed it amounted to a conflict of interest. Father's fourth attorney moved to withdraw from representing Father because of Father engaging the unprofessional and threatening conduct previously discussed. Father's fifth attorney moved to withdraw from representing Father because counsel was hospitalized. Father's sixth attorney was appointed to represent Father on March 12, 2020, and Father had the trial court remove the attorney as his counsel at the permanent custody hearing. The record therefore indicates that Father was not consistently represented by counsel largely due to his own actions. In any event, Father has failed to establish that any of the attorneys' reasons for withdrawing as his counsel amounted to an unprofessional error that fell below an objective standard of reasonable representation.

{¶ 81} Lastly, Father argues that all six of his attorneys provided ineffective assistance because they all failed to file objections to his case plan. The record, however, indicates that Father objected to his case plan in his pro se "Motion to Declare/Determine Father's Parental Rights" filed on April 10, 2019. Father also filed a pro se "Submission of Proposed Changes to the Case Plan" on April 12, 2019, wherein Father suggested various amendments to the case plan. On May 3, 2019, the trial court held a hearing on the matter and issued an order addressing the objections and issues raised in Father's motions. Because Father did file objections to his case plan, he cannot establish that he was prejudiced by his attorneys' failure to file objections.

{¶ 82} We note that even if Father had additional objections that were not raised in the court below, it is pure speculation that raising those objections would have changed the outcome of the trial court's permanent custody decision. It is well established that

mere speculation cannot support either the deficient performance or prejudice requirement of an ineffective-assistance claim. *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119; *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217.

{¶ 83} Because Father is foreclosed from raising an ineffective assistance of counsel claim due to his waiving his right to counsel, and because all of Father's ineffective assistance of counsel claims raised in this appeal lack merit, Father's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 84} Under his fourth assignment of error, Father argues that his right to free speech under the First Amendment to the United States Constitution was violated when he was criminally trespassed from MCCS property for speaking out against MCCS. Although not argued explicitly, it appears as though Father is claiming that the trial court's permanent custody decision was affected by the alleged First Amendment violation because Father's visitation with R.W.H. was suspended following the criminal trespass.

{¶ 85} "As a general rule, the First Amendment to the United States Constitution protects citizens from government actions that abridge free speech." *Puterbaugh v. Goodwill Industries of the Miami Valley, Inc.*, 2d Dist. Miami No. 2013-CA-39, 2014-Ohio-2208, ¶ 35, citing *Hudgens v. N.L.R.B.*, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). "The right to free speech secured by the First Amendment is not absolute, however, and the government may regulate it in a manner that is consistent with the Constitution." *Bey v. Rasawehr*, 161 Ohio St.3d 79, 2020-Ohio-3301, 161 N.E.3d 529,

¶ 21, citing *Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). "It has been recognized that threats which intimidate or cause fear or apprehension by the recipient are unprotected by the First Amendment." *State v. Myers*, 3d Dist. Henry No. 7-99-05, 2000 WL 327238, *3 (Mar. 30, 2000), citing *Dayton v. Dunnigan*, 103 Ohio App.3d 67, 71, 658 N.E.2d 806 (2d Dist.1995). (Other citations omitted.). Moreover, R.C. 2903.21, Ohio's aggravated menacing statute, criminalizes "knowingly caus[ing] another to believe that the offender will cause serious physical harm to the person or property of the other person." This court has held that "[t]he crime of aggravated menacing is triggered by a threat which intimidates or causes fear or apprehension by the recipient," and that "[s]uch threats are not among the class of utterances which are protected by the First Amendment." *Dunnigan* at 71.

{¶ 86} In this case, MCCS presented Father's Notice of Criminal Trespass as evidence at the permanent custody hearing. *See* State's Exhibit No. 25. The notice established that on August 27, 2019, Father was trespassed from MCCS property because he had made threatening statements of causing serious physical harm to MCCS employees. There was also testimony presented at the permanent custody hearing indicating that Father had threatened to use an automatic weapon to blow up MCCS staff. *See* Tr. p. 168. Such threats of serious physical harm are not protected under the First Amendment. Therefore, Father's claim that his First Amendment rights were violated after being criminally trespassed for making these threats lacks merit.

{¶ 87} Father's fourth assignment of error is overruled.

**Fifth Assignment of Error**

{¶ 88} Under his fifth assignment of error, Father contends that his constitutional right to due process was violated in several different ways during the pendency of this case.  We disagree.

{¶ 89} It is well established that "[a] parent must be given every procedural and substantive protection the law allows prior to parental rights being terminated."  *In re J.Z.*, 10th Dist. Franklin No. 05AP-8, 2005-Ohio-3285, ¶ 9, citing *In re Hayes*, 79 Ohio St.3d 46, 679 N.E.2d 680 (1997).  "[B]ecause parents possess a fundamental liberty interest in the care and custody of their children, the state may not deprive parents of their parental rights without due process of law."  *In the Matter of J.T.*, 2019-Ohio-465, 129 N.E.3d 946, ¶ 30 (4th Dist.), citing *In re James*, 113 Ohio St.3d 420, 2007-Ohio-2335, 866 N.E.2d 467, ¶ 16.  "Due process includes a hearing upon adequate notice, assistance of counsel, and under most circumstances, the right to be present at the hearing."  (Citation omitted.)  *In re J.Z.* at ¶ 9.  "[A] parent's right to due process 'does not evaporate simply because' that parent has 'not been [a] model parent[ ] or [has] lost temporary custody of their child to the State.' "  *In the Matter of J.T.* at ¶ 29, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

{¶ 90} Father first claims that he was denied due process because MCCS moved for permanent custody of R.W.H. before his paternity was established, which Father claims prevented him from being a viable placement option.  The record, however, indicates that five months after Father's paternity was established, MCCS withdrew its initial motion for permanent custody.  The record also indicates that MCCS amended Father's case plan to reflect his paternity and attempted to work with Father in completing his new case plan objectives.  The fact that MCCS took these steps and attempted to

work with Father belies Father's claim that he was never considered a viable placement option. Moreover, the record indicates that Father specifically told his MCCS case worker Bradley Woods that he did not want to work on a case plan. Father also expressed a desire for R.W.H. to be placed with G.A. For these reasons, Father's first due process claim lacks merit.

{¶ 91} Father next claims that he was denied due process because he was not consistently represented by counsel during the pendency of this case and was not appointed an attorney until four months before the permanent custody hearing. However, as previously discussed, the record indicates that Father was appointed six different attorneys to represent him in this matter and that a majority of the attorneys were either removed at Father's request or withdrew from representing Father due to Father's own conduct. Therefore, we find that the timing of his last attorney's appointment and the periods of time that Father went without legal representation were largely attributable to Father and not to a denial of due process. The trial court went above and beyond by continually appointing counsel to represent Father in this matter. Therefore, Father's second due process claim lacks merit.

{¶ 92} Father also claims that he was denied due process because his sixth counsel refused to issue subpoenas for the permanent custody hearing. However, other than Father's own self-serving statements, there is nothing in the record establishing that Father's sixth attorney refused to issue subpoenas. Furthermore, as previously discussed, the record indicates that Father was in fact able to issue subpoenas for the permanent custody hearing. We note that Father takes issue with the fact that he was unable to serve C.R. with a subpoena prior to the hearing; however, this does not amount

to a due process violation. There is also nothing in the record to suggest that C.R.'s testimony would have affected the outcome of the permanent custody proceeding. For these reasons, Father's third due process claim lacks merit.

{¶ 93} Father additionally claims that his right to due process was violated because the trial court failed to hold a timely hearing on motions to reinstate visitation that Father filed on December 3, 2019, and January 10, 2020. In both of these motions, Father requested that the trial court issue an order reinstating his visitation because he disputed the facts supporting the trespass order that precipitated the suspension of his visitation with R.W.H. In the second motion, Father also requested that the trial court hold an expedited hearing on the matter. Less than a month after the second motion was filed, the trial court issued an order on February 3, 2020, addressing Father's motions to reinstate visitation. The trial court's order stated, in pertinent part, as follows:

> [T]his Court held a hearing on Montgomery County Children Services' request to suspend [Father's] visitation on August 29, 2019. [Father] appeared, and was given the opportunity to be heard on the issues, including his dispute of the underlying facts presented to the Court. Following the hearing, this court found it to be in the child's best interest to suspend [Father's] visitation with the child. * * * The Court does not deem [this] issue[ ] to be of an emergency nature or necessitating an expedited hearing.

Order (Feb. 3, 2020).

{¶ 94} The trial court denied Father's request to hold an expedited hearing on the matter and ordered Father's motion to reinstate visitation to be heard during the

permanent custody hearing, which took place on July 6 through 9, 2020. Upon review, we find no due process violation with regard to the trial court's decision to wait and resolve the motion to reinstate at the permanent custody hearing. Father had previously been given the opportunity to be heard on the issues raised in his motion to reinstate visitation, as Father simply disputed the facts underlying the trespass order. As noted by the trial court, the issues in Father's motion were not of an emergency nature that required an expedited hearing. Accordingly, Father's fourth due process claim lacks merit.

{¶ 95} Lastly, Father argues that MCCS had viable relative placement options which would have avoided the need for it to file a motion for permanent custody of R.W.H. This argument, however, ignores MCCS's duty under R.C. 2151.413(D)(1) to file a motion for permanent custody "if a child has been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period." Therefore, Father's fifth and final due process claim also lacks merit.

{¶ 96} Because Father has failed to establish any denial of due process, his fifth assignment of error is overruled.


## Conclusion

{¶ 97} Having overruled Father's five assignments of error, the judgment of the trial court granting MCCS permanent custody of R.W.H. and denying G.A.'s motion for legal custody of R.W.H. is affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Maria L. Rabold
Amy Bailey
G.A.
Phillip Reid
Hon. Helen C. Wallace